**Louis MIANO, Plaintiff,**

v.

**AC & R ADVERTISING, INC., Defendant.**

**Michael R. WIDENER, Plaintiff,**

v.

**AC & R ADVERTISING, INC., Defendant.**

**Morton WEINSTEIN, Plaintiff,**

v.

**AC & R ADVERTISING, INC., Defendant.**

**Nos. 91 Civ. 1280 (LBS), 91 Civ. 1676 (LBS) and 91 Civ. 3906 (LBS).**

United States District Court, S.D. New York.

Feb. 25, 1993.

As Amended March 4, 1993.

72

Richard W. Meirowitz, New York City, for plaintiffs.

Gerald S. Hartman, Anderson Kill Olick & Oshinsky, P.C., New York City, for defendant.

## MEMORANDUM OPINION

KATZ, United States Magistrate Judge.

These cases, consolidated for discovery purposes, involve allegations of age discrimination by three individuals who were terminated by their former employer, AC & R Advertising, Inc. ("AC & R").[1] In support of their case, plaintiffs propose to offer in evidence, for impeachment and admission purposes, tape-recorded conversations which plaintiff Louis Miano, and in one case, plaintiff Michael Widener, had with employees of AC & R. These recordings were made by Miano and Widener without the consent or knowledge of the individuals being taped.

Defendant has moved to preclude plaintiffs from offering the tapes in evidence, or using them in any way at trial, claiming that they constitute *ex parte* communications with represented parties, secured at the behest of plaintiffs' counsel, Richard Meirowitz, in vio-

---

1. A fourth case, *Forgione v. AC & R Advertising, Inc.*, 91 Civ. 1917, had also been consolidated with these cases and involved in the litigation of the instant motion. That case has since been settled.

lation of Disciplinary Rule 7–104(A)(1) of the American Bar Association's (ABA) and New York State Bar Association's (NYSBA) Codes of Professional Responsibility (hereinafter "DR 7–104(A)(1)"). Alternatively, defendant contends that the tapes should be excluded because the surreptitious taping activity by Miano was suggested and encouraged by his counsel, and constitutes "conduct involving dishonesty, fraud, deceit or misrepresentation," in violation of DR 1–102(A)(4) of the ABA and NYSBA Codes of Professional Responsibility (hereinafter "DR 1–102(A)(4)").[2]

After reviewing the parties' submissions on the motion and hearing oral argument, it became apparent that there were significant factual disputes, involving witness credibility, which required resolution. A hearing was therefore held, involving several days of testimony, at which, *inter alia*, plaintiff Miano and his counsel, Richard Meirowitz, testified. Post-hearing Proposed Findings of Fact were submitted. Having considered all of the submissions and hearing testimony in light of the relevant law, for the reasons that follow I conclude that the evidence derived from the taped conversations need not be excluded at trial.

BACKGROUND

Plaintiff Louis Miano was terminated from his employment with AC & R, on May 15, 1990, by Stephen Rose, defendant's former Chief Executive Officer. At the time of his termination, Miano served as AC & R's Director of Creative Services. On several occasions between May and August 1990, Miano had conversations with a former colleague and Vice–Chairman at AC & R, Harry Koenig, about his termination. Koenig told him about a meeting in California of the Management Committee of AC & R, at which Rose was heard to make remarks about Miano's age, and which led Miano to believe that he was terminated for reasons related to his age. Koenig told him that Rose's statements could be corroborated by other senior level employees of AC & R who attended the meeting.

Using tape-recording equipment obtained from a company recommended by attorney Richard Meirowitz, Miano began, on August 28, 1990, to record telephone and in-person conversations with present and former managerial-level employees of the defendant, including Koenig. In total, Miano recorded forty-three (43) conversations with nineteen (19) different AC & R employees, during the period between August 28, 1990 and April 18, 1991.[3] There is no evidence, nor allegation, that plaintiff's attorney participated in any of the conversations which are the subject of this motion.

In August of 1990, Miano first met with Meirowitz to seek legal advice. There is a dispute as to whether that meeting related to the matters at issue in this case or a wholly unrelated matter. On October 3, 1990, Miano met again with Meirowitz and formally retained him to pursue an age discrimination suit against AC & R. During that meeting, Miano discussed conversations that he had already taped with Koenig and Patrick King, President of AC & R. During the ensuing months, Miano continued to tape conversations with management-level personnel of AC & R, some of whom he knew and had been friendly with. Periodically, he discussed information he had obtained with Meirowitz.

On December 17, 1990, Meirowitz filed on Miano's behalf an age discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights. On February 21, 1991, Miano's Complaint in this action was filed. On March 4, 1991, an attorney with the firm of Anderson Kill Olick & Oshinsky, Gregory Homer, notified Meirowitz that his firm would be representing AC & R in

---

**2.** Plaintiffs cross-moved, pursuant to Rules 36 and 37(a)(4), Fed.R.Civ.P., for an order deeming admitted matters set forth in their Third Request For Admissions, relating to the accuracy of the transcriptions of the tape recorded conversations. At the oral argument of these motions, defendant's counsel agreed to stipulate to the authenticity of the tape transcriptions, thus resolving plaintiffs' cross-motion.

**3.** For purposes of these actions, plaintiffs seek to utilize and rely upon sixteen (16) conversations taped by Miano between August 28, 1990 and January 11, 1991. A seventeenth taped conversation which is relied upon, was made by plaintiff Widener on April 17, 1991. The tapes are specified in Appendix A to this Opinion.

the *Miano* action. AC & R filed its Answer in this action, along with a set of interrogatories, on March 14, 1991. In response to the interrogatories, plaintiff informed defendant of the existence of the taped conversations and made the tapes themselves available to defendant's counsel.

Michael Widener, the plaintiff in another of these actions, was terminated by defendant on April 18, 1990. He retained Meirowitz to represent him on December 21, 1990.[4] The one tape in issue made by Widener involves a conversation he had on April 17, 1991, with Robert Woodworth, a former Senior Vice–President of AC & R. There is no dispute that, at the time of the conversation, Woodworth was no longer employed by AC & R. No evidence has been adduced relating to any involvement by Meirowitz in the taping of that conversation or of prior knowledge he had that Widener intended to have such a conversation.

DISCUSSION

■ Attorneys practicing in this Court must adhere to the Codes of Professional Responsibility of both the American Bar Association ("ABA Code") and New York State Bar Association ("NYSBA Code"), and may be dealt with directly by the Court or referred for discipline for conduct which violates the ethical proscriptions of those Codes. *See* Southern District of New York General Rules 2(a), 4(f) and 4(k). Although the restrictions of professional codes are not statutorily mandated, "federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar." *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir.1988) (citing *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881, n. 6, 86 L.Ed.2d 504 (1985)).

■ As the Second Circuit held in the *Hammad* case, in the context of a criminal action, when an attorney secures evidence in violation of the disciplinary rules, suppression of the evidence is an appropriate remedy which a district court may impose in its discretion. Nevertheless, the Circuit observed that the court's discretion should be exercised cautiously, "with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth". *United States v. Hammad*, 858 F.2d at 842.[5]

■ In another line of cases, the Court of Appeals has made clear that "[t]he business of the court is to dispense with litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the case before it." *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976); *accord United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988). While courts may impose appropriate sanctions for attorney misconduct, "the sanctions, absent some serious prejudice to the witness or taint to the trial, should be disciplinary action ...." *United States v. Dennis*, 843 F.2d at 657; *accord W.T. Grant*, 531 F.2d at 677; *see also, Suggs v. Capital Cities/ABC, Inc.*, No. 86–2774, 1990 WL 182314, at *1 (S.D.N.Y. April 24, 1990); *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1082–83 (S.D.N.Y.1989); *Stagg v. New York City Health and Hospital Corp.*, 162 A.D.2d 595, 596, 556 N.Y.S.2d 779, 780 (2d Dept.1990) (New York follows common law rule that evidence is admissible even if unethically obtained); "Suppressing Evidence Obtained in Violation of DR 7–104: If *Hammad* Is Right, Is the Civil Law Wrong?", Committee on Professional Responsibility of the Association of the Bar of the City of New York, The Record of the Association of the Bar of the City of New York, Vol. 49, No. 4, May 1992, *passim* (questioning the reasoning of *Hammad* and endorsing disciplinary action rather than suppression of evidence).

In this action, defendant contends that plaintiff's counsel, Richard Meirowitz, violat-

---

4. Meirowitz filed charges with the EEOC on Widener's behalf on January 7, 1991, and filed a Complaint with this court on March 11, 1991. Defendant answered the Complaint on April 2, 1991. The Complaint and Answer in the *Weinstein* action were filed on June 11, 1991 and July 12, 1991, respectively.

5. In *United States v. Hammad*, the Court reversed the district court's order suppressing evidence because, at the time of the conduct in issue, the law was unsettled as to whether DR 7–104(A)(1) was applicable to the pre-indictment stage of a criminal proceeding.

ed two disciplinary rules. First, it is argued that he violated DR 7–104(A)(1), which provides in pertinent part that:

> During the course of his representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate with a party [the lawyer] knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

■ The Rule is intended to: (1) prevent situations in which a represented party is taken advantage of through the greater skill of an adversary's attorney; (2) prevent an attorney from circumventing opposing counsel to obtain unwarranted concessions or liability-creating statements or disclosures from a party; (3) preserve the integrity of the attorney-client relationship; (4) prevent the disclosure of protected information, most particularly attorney-client communications; and (5) allow a party in litigation to have disclosed to it facts acquired by its adversary, through adequate and timely discovery. *See United States v. Jamil,* 707 F.2d 638, 645 (2d Cir.1983); *Lizotte v. New York City Health and Hospital Corp.,* No. 85–7548, 1990 WL 267421, at *4 (S.D.N.Y. March 13, 1990); *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621, 625 (S.D.N.Y.1990); *Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F.Supp. at 1084; *Suggs v. Capital Cities/ABC,* 1990 WL 182314, at *4–5; *Frey v. Health and Human Services,* 106 F.R.D. 32, 34 (E.D.N.Y.1985).

■ Needless to say, the disciplinary rules of the Codes of Professional Responsibility do not apply to Mr. Miano or Mr. Widener, neither of whom are attorneys. Therefore, whether plaintiffs' counsel violated DR 7–104(A)(1) in these proceedings turns upon the resolution of three issues: (1) Were the persons with whom Miano and Widener spoke "parties"? (2) Were the challenged communications with parties who were known to be represented by a lawyer in this matter? (3) Did Meirowitz "cause" his clients, Miano or Widener, to communicate with the defendant?

Defendant contends that the evidence supports the conclusion that Meirowitz knew of and benefited from the challenged conversations, and either advised or encouraged them, in violation of the disciplinary rule. Indeed, defendant contends that Meirowitz and Miano have knowingly concealed evidence and lied to cover up the fact that Meirowitz actually sent Miano to a company that would equip him to tape the disputed conversations; that Meirowitz was the true client of the taping company and even paid some of its invoices; that Meirowitz guided Miano in his taping activity; and that the taped *ex parte* conversations continued until plaintiff could no longer conceal them from defendant.

Plaintiff Miano contends that: (1) he, on his own, and prior to his retention of Meirowitz, initiated conversations with former colleagues at AC & R regarding his termination; (2) his initial meetings with Meirowitz and request for information on taping related to a matter totally unrelated to this action; (3) Meirowitz himself never engaged in conversations with defendant's employees nor suggested that plaintiff engage in those conversations; and (4) up until at least March of 1991, neither he nor his counsel had any knowledge or belief that defendant was represented by counsel in this matter and, indeed, they contend that defendant was not actually represented by counsel until at least that time. He further contends that all of the taped conversations were fully disclosed to defendant in the course of discovery in this action; in fact, the tapes and transcripts of those conversations have been provided to defendant's counsel. In sum, plaintiffs' position is that no disciplinary rule was violated because the conversations in issue were neither engaged in nor caused by an attorney, and were with employees of the defendant at a time when defendant was not yet represented. Further, they argue that this is not a situation where an attorney took advantage of a party by using his superior skill to secure information in a manner calculated to avoid the advice and assistance of counsel.

■ The second disciplinary rule defendant contends has been violated, DR 1–102(A)(4), prohibits a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." Al-

though in many states, including New York, it is not illegal for one party to a conversation to record the conversation without the other party's knowledge or consent, there is authority for the proposition that it is unethical for an attorney to do so, since such conduct is considered to involve deceit or misrepresentation. *See Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *Roe v. Operation Rescue,* No. 88–5157, 1989 WL 66452, at *3 (E.D.Pa. June 19, 1989), *aff'd* 898 F.2d 142 (1990); ABA Committee on Ethics and Professional Responsibility, Formal Opinion 337 (1974); New York State Bar Association Opinion No. 328 (March 18, 1974) (secret recording "offends the traditional high standards of fairness and candor that should characterize the practice of law and is improper except in special situations ..."). Conduct governed by this ethical proscription does not turn upon whether the person who is the target of the taping is a party represented in the matter in issue.

It is not argued, nor is there any evidence to suggest, that Meirowitz personally engaged in clandestine taping activity. Defendant argues, however, that the tapes which Miano made should be excluded as evidence because Meirowitz improperly used Miano to circumvent DR 1–102(A)(4). *See* DR 1–102(A)(2) ("A lawyer shall not ... circumvent a Disciplinary Rule through actions of another.") Whether Meirowitz used Miano to circumvent DR 1–102(A)(4) involves consideration of factors virtually identical to those relevant to determining whether Meirowitz

"caused" Miano to engage in *ex parte* conversations in violation of DR 7–104(A)(1), *i.e.,* did he use Miano as his "alter ego", by advising, suggesting or directing the taping. Had Miano taped his conversations at the instance of Meirowitz, Meirowitz himself could be considered guilty of unethical conduct. *See, e.g.,* ABA Informal Opinion 1320 (1975). Because the facts relevant to resolution of this issue are the same facts necessary to resolve whether Meirowitz "caused" Miano to violate DR 7–104(A)(1), both issues will be addressed jointly in Section III, *infra.*

I. *Were The AC & R Employees With Whom Miano Spoke "Parties" For Purposes of DR 7–104(A)(1)?*

▮▮▮ Although there has been much discussion and controversy in the courts and among bar associations over who may be considered a "party" under DR 7–104(A)(1), whatever disagreement has existed is of little moment given the facts of this case. There are sixteen (16) conversations in issue which occurred between Mr. Miano and nine (9) employees of the defendant. Eight of those individuals were highly placed, management-level employees.[6] Plaintiffs have taken the position that all of their statements, which were recorded, constitute admissions by AC & R.[7] As to these individuals, there is no serious dispute between the parties that each of these employees should be considered a "party" within the meaning of DR 7–104(A)(1), either because: (1) he/she had high-level managerial responsibility and was capable of binding the corporation; or (2) his/her acts or omissions may be imputed to the corporation for purposes of civil or crimi-

---

**6.** Those individuals are: Harry J. Koenig, Vice–Chairman & Chief Financial Officer of AC & R; Karen Amorelli, President of AC & R New York; Alvin Chereskin, Chairman and Chief Executive Officer of AC & R; Susan Yusi, Vice–President and Comptroller of AC & R; Clark Wilson, Senior Vice–President and Management Supervisor of AC & R, Irvine; Jack Gerken, Senior Vice–President of Public Relations of AC & R, Irvine; Carolyn Johnson, Senior Vice–President and Creative Director of AC & R, Irvine; Lynn Livingston, President and Chief Operating Officer of AC & R, Irvine.

**7.** Plaintiffs initially argued that the statements were to be used for impeachment purposes only. Subsequently, in a letter to the Court from plaintiffs' counsel, dated July 27, 1992, plaintiffs took

the position that they were also to be offered as party admissions, pursuant to Rule 801(d), Fed. R.Evid. The Court need not resolve the issue of whether these statements actually are admissible at trial as admissions of a party-opponent. Since plaintiffs seek the benefit of attributing the AC & R employees' statements to the corporate defendant, their counsel's conduct must be judged as involving a "party" under DR 7–104(A)(1). *Cf. Frey v. Department of Health and Human Services,* 106 F.R.D. at 38 (Plaintiff's counsel ... cannot have it both ways since the employees will not be deemed by this court to be non-parties for purposes of DR 7–104 but "parties" for purposes of Fed.R.Evid. 801(d)(2)(D)); *accord, McKitty v. Board of Education,* No. 86–3176, 1987 WL 28791, *3 (S.D.N.Y. December 16, 1987).

nal liability; or (3) his/her statements may constitute an admission by AC & R. *See, e.g., Polycast,* 129 F.R.D. at 624; *Massa v. Eaton Corp.,* 109 F.R.D. 312, 313 (W.D.Mich. 1985); *University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 327 (E.D.Pa.1990); *Chancellor v. The Boeing Co.,* 678 F.Supp. 250, 253 (D.Kan.1988); *McKitty v. Board of Education,* No. 86–3176, 1987 WL 28791 at *2 (S.D.N.Y. December 16, 1987) (under the circumstances of case, "parties" are those employees who are "alter egos" of entity, *i.e.,* have the authority to bind the corporation); *Niesig v. Team I,* 76 N.Y.2d 363, 373–74, 559 N.Y.S.2d 493, 498, 558 N.E.2d 1030, 1035 (1990) ("party" includes senior management as well as corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation or are imputed to the corporation for purposes of liability, or who are implementing the advice of counsel); *Morrison v. Brandeis University,* 125 F.R.D. 14, 16–18 (D.Mass.1989); Comments to Rule 4.2 of the ABA Model Rules of Professional Conduct and Code of Judicial Conduct (1983), at 79.[8]

■ The only other individual whose taped statements plaintiffs intend to use at trial is William Royce. Royce was the Executive Assistant to Stephen Rose, the former Chief Executive Officer (CEO) of AC & R; he did not hold a management-level position and plaintiffs have acknowledged that his statements cannot be imputed to the corporation or be binding admissions against AC & R. The statements will be used only for impeachment purposes. Therefore, Royce does not fit any definition of a "party" under DR 7–104(A)(1).

## II. *Was AC & R "Represented" At the Time of Miano's Conversations?*

■ An attorney's conduct may run afoul of DR 7–104(A)(1) only when he communicates or he causes someone else to communicate *ex parte* with a "party *he knows to be represented* by a lawyer in [the] matter ..." (emphasis added). Although I have concluded that most of the AC & R employees Miano spoke with were "parties" for purposes of the Rule, it is not at all clear that AC & R was known to be or was actually represented in this matter when the taped conversations occurred. Resolution of this issue is complicated by the fact that the majority of the conversations occurred prior to the initiation of this litigation.

It has been recognized that DR 7–104(A)(1) should have force even before actual litigation is commenced. *See, e.g., United States v. Hammad,* 858 F.2d at 839 (because timing of indictment lies within control of prosecutor, court "resist[s] binding the Code's applicability to the moment of indictment"); *United States v. Guerrerio,* 675 F.Supp. 1430, 1438 n. 16 (S.D.N.Y.1987) (dictum in criminal case that, in civil context, DR 7–104(A)(1) applies before the formal initiation of lawsuit; *Federal Savings and Loan Insurance Corp. v. Hildenbrand,* No. 89–A–535, 1989 WL 107377, at *4 (D.Colo. September 8, 1989) (protection of DR 7–104(A)(1) not dependent upon existence of a civil action); NYSBA Ethics Opinion No. 607 (February 15, 1990); *see also,* Geoffrey C. Hazard, Jr. and William Hodes, *The Law of Lawyering, A Handbook on The Model Rules of Professional Conduct,* at 733–34 (2d ed. 1990) (proper reading of rule would count as off limits any party with whom a lawyer already has an adverse relationship, whether or not litigation has been filed). However, prior to litigation and without specific notice, there may often be uncertainty at to whether or not a party is represented. Conversely, once an action is filed, or at least shortly

---

8. Although, earlier in this dispute, the parties disagreed as to whether *former* employees of AC & R should be considered "parties" for purposes of the disciplinary rule, the conversations now in issue, with the one exception of that between Mr. Widener and Mr. Woodworth, on April 17, 1991, were all with employees who, at the time, still worked for AC & R. As for the Widener/Woodworth conversation, there is no evidence that it was either engaged in or "caused" by counsel. In any event, plaintiffs do not intend to offer Woodworth's statements as binding admissions of AC & R and it is now widely accepted that except where there is the possibility of disclosure of attorney-client privileged communications, former employees are not considered "parties" ·under DR 7–104(A)(2). *See Polycast,* 129 F.R.D. at 625–628; *Lizotte,* 1990 WL 267421 at *5, n. 7; *Hanntz v. Shiley, Inc.,* 766 F.Supp. 258, 263 (D.N.J.1991); *Dubois v. Gradco Systems, Inc.,* 136 F.R.D. 341 (D.Conn.1991); ABA Formal Opinion 91–359 (March 22, 1991).

thereafter, it is likely to become apparent that representation exists.

Here, both Meirowitz and Miano disclaim any knowledge of AC & R's representation, at least until March of 1991, when Meirowitz was actually contacted by an attorney retained by AC & R. The facts related to AC & R's purported representation were testified to by Harry Koenig who, as a Vice-Chairman of AC & R, was legal liaison at AC & R and had authority to hire legal counsel. Essentially, in his affidavit dated May 13, 1992 (Exhibit AA to Defendant's Reply Memorandum) and his hearing testimony, Koenig asserted that AC & R, during the period of 1989–91, consulted with various in-house counsel and/or outside counsel regarding employment matters and the termination of employees, particularly where litigation was threatened or anticipated. Koenig set forth a litany of attorneys he claimed did work for AC & R on personnel matters. 8/11/92 Hearing Transcript [9] at 4–5, 14–15, 18–19, 22, 43–46, 48–50, 55–56, 68–70, 79–81, 86–87.

Nevertheless, during 1990 and 1991, the years most pertinent to this motion, AC & R did not have a full-time in-house counsel. While two individuals, Ken Simon and Stephen Shepherd, had been full-time counsel in earlier years, by 1990 Simon was consulted on an *ad hoc* basis, as was Shepherd, who was with a private law firm. *Id.* at 110, 115. Indeed, by November 1990, Simon's services had been completely terminated. *Id.* at 109. In any event, there is no evidence that Miano's termination or lawsuit was discussed with either of them. Further, although in the course of his employment Miano had met Ken Simon and was aware he had been involved in some legal matters for AC & R, Miano knew that Simon had been replaced in 1986, only saw Simon at AC & R once or twice after 1986, did not know his status at AC & R and assumed he had retired. 9/16/92 HT at 47. Miano did not know, had not heard of, and was unaware of any legal

work done for AC & R by any of the outside attorneys, with one exception, whom Koenig claimed had handled various labor matters for AC & R.

■■■ Among the attorneys Koenig claims AC & R consulted, and with whom he specifically discussed matters related to the plaintiffs in these cases, were Elke Stone, of the firm of Hall, Dickler, Kent and Friedman, and Maggie Heim, of Mitchell, Silberberg & Knupp. The only relevant issue he spoke to Elke Stone about was a potential settlement agreement with Mr. Weinstein, in October 1990. 8/11/92 HT at 22. At the time, Mr. Stone's firm was not even on a retainer to AC & R (it previously had been), but was providing services on an hourly basis. *Id.* at 48. There is no suggestion that Hall, Dickler or Elke Stone were ever consulted about Miano.[10]

Although Koenig claimed he sought advice from Maggie Heim of Mitchell, Silberberg & Knupp, regarding Miano's and Widener's termination, in fact Koenig had one conversation with her in May 1990, following the meeting in California where AC & R's CEO discussed Miano's age and termination. The reason for the conversation was that other employees of AC & R who had been at the meeting had approached Koenig about what the CEO had said. *Id.* at 69, 121–23. The only other conversation Koenig had with Heim was to inform her, some time in January of 1991, of the EEOC charges filed by Miano. *Id.* at 126–27. Heim never took any action with regard to that filing or provided any service to AC & R related to Miano's termination. Heim never had any contact with Miano and there is no reason to believe Miano or Meirowitz had any knowledge of her existence. Heim was only consulted by AC & R on particular employment problems which arose in California. *Id.* at 48. By no stretch of the imagination could she be said to have been representing AC & R on the *Miano* matter.

---

9. The hearing on this motion took place on August 11, 1992 (hereinafter "8/11/92 HT"), August 13, 1992 (hereinafter "8/13/92 HT"), and September 16, 1992 (hereinafter "9/16/92 HT").

10. Miano had not heard of the Hall, Dickler firm, but he had heard of Elke Stone at some time in the past. 9/16/92 HT at 46, 195. While there is

some evidence that Stone, Stephen Shepherd and Martin Tucker were identified as legal liaison to certain staff at AC & R in a memorandum dated January 4, 1990, Plaintiff's Hearing Exhibit 4, Miano did not recall ever receiving or seeing that memo. 9/16/92 HT at 112.

Koenig also testified that he discussed Miano with Michael Kopcsak, who was in-house counsel to Saatchi & Saatchi, AC & R's parent company, as well as a director of AC & R. However, whatever discussion they had did not occur until some time in December 1990 or January 1991, after AC & R received Miano's EEOC complaint. Mr. Kopcsak took no action with respect to the matter, and simply advised Koenig to contact attorneys at Anderson Kill Olick & Oshinsky ("AKOO"), who are counsel in this proceeding. Koenig had no reason to believe Miano, Meirowitz or any of the plaintiffs knew of Mr. Kopcsak. 8/11/92 HT at 50, 132–138.

Koenig, on behalf of AC & R, first contacted AKOO on January 14, 1991, some weeks after Miano filed his age discrimination charge with the EEOC. Koenig had a telephone conference with an AKOO attorney that day. 8/11/92 HT at 50, 54, 142. As of the end of February, 1991, that one telephone conversation had been the only involvement Koenig had with AKOO regarding Miano. *Id.* at 52–54. AKOO never filed any papers with the EEOC in response to Miano's charges. 8/13/92 HT at 148. AKOO was not consulted about any of the other plaintiffs until several months later, when they filed their EEOC charges.

On March 4, 1991, after AKOO had received the Complaint in this action, one of its attorneys, Gregory Homer, called Meirowitz and informed him that AKOO represented AC & R. That conversation was the first time Meirowitz was actually made aware of AKOO's or any other attorney's representation of AC & R. Homer followed the conversation up with a letter to Meirowitz, dated March 5, 1991 essentially repeating what he had said on the telephone. *See* Exhibit K to Defendant's Memorandum in Support of the Motion. Homer asked Meirowitz to inform Miano that if he wished to contact any AC & R employees in an effort to seek AC & R documents and materials, which he had learned Miano had done, he should do so through counsel. At some point in March, Meirowitz informed Miano that he had been contacted by a law firm on behalf of AC & R. Apparently, they did not discuss the implica-

tions of the appearance of counsel on Miano's taping activity. 9/16/92 HT at 85–87; 8/13/92 HT at 150–152; 155–56.

AKOO filed its Answer to the Complaint in this action on March 18, 1991. *Id.* at 150. Miano continued taping conversations with present or former AC & R employees through April 18, 1991. In his April 15, 1991 responses to defendant's first set of interrogatories, Meirowitz informed AC & R's counsel of the existence of the taped conversations.[11]

Miano and Meirowitz disavowed having any knowledge that AC & R was represented in any matters related to Miano until March 1991, long after most of Miano's conversations with AC & R employees took place. Meirowitz never heard of any of the attorneys mentioned by Koenig, but he acknowledged that he did not make any effort to discover if AC & R was in fact represented by counsel. 8/13/92 HT at 47, 146–47, 158.

With respect to the conversations Miano had with AC & R employees prior to March 5, 1991, I cannot conclude that Meirowitz knew AC & R to be represented by counsel in matters relevant to Miano's termination or, indeed, that AC & R was actually represented. I do not accept AC & R's contention that simply because it made use, on an as needed basis, of the services of various attorneys, that it should therefore be deemed to have been represented in this matter prior to AKOO's retention. On that theory, any person or entity which faced potential liability because of its conduct, could be considered to be "represented" as long as it had utilized an attorney's services in the past on other matters. Something more must be required to deem a party "represented" under the disciplinary rule.

There is a dearth of authority on this issue, but particularly apposite is the court's decision in *Federal Savings and Loan Insurance Corp. v. Hildenbrand,* No. 89–A–535, 1989 WL 107377 (D.Colo. September 8, 1989). There, an attorney pursuing an investigation on behalf of the plaintiff, concerning the failure of a savings and loan company and possible wrongdoing by its officers and employees,

**11.** Transcripts of the tapes were subsequently provided to the defendant.

conducted interviews with one of the employees (a potential defendant) about the business in general and some of his own transactions. He did not ask the employee whether he was represented by counsel. Subsequently the defendant became aware that he might become the subject of a lawsuit and he consulted his attorney. After doing so and informing plaintiff's attorney that he was then represented, plaintiff's counsel never spoke with him directly again. The court held that counsel's initial contacts with the defendant did not violate DR 7–104 because, at the time, he was not a party "represented" by counsel. Although it recognized that the protection of DR 7–104(A)(1) is not dependent upon the existence of a civil action, it held that:

> [An] organization should be considered a party anytime it has specifically retained counsel to represent its interests regarding the subject of representation or has specifically referred the matter to house counsel ... [T]he retaining of an attorney by a party claiming protection of the rule must have a nexus to a potential dispute ... The fact that Hildenbrand had counsel "for general business purposes" was irrelevant, however, absent a specific connection to a potential lawsuit. He was not a party to any litigation at that point, nor had he retained [counsel] for the purposes of defending himself against possible allegations of wrongdoing. . . .

Id., 1989 WL 107377 at *4. See also, United States v. Jamil, 707 F.2d at 640 (Assistant United States Attorney aware that target had retained counsel to represent him regarding investigation); United States v. Hammad, 678 F.Supp. 397, 399 (E.D.N.Y. 1987), rev'd on other grounds, 858 F.2d 834, 837 (2d Cir.1988) (government was aware defendant had retained counsel prior to indictment); but compare, Florida State Bar Association Committee on Professional Ethics Opinion 78–4, 1978 WL 21716 (FLA.ST. BAR ASSN.) (1978) (where individual or corporation has general counsel representing it in all legal matters, that person must be communicated with; dissenting members conclude that specific matter would have to have been referred to general counsel for corporation to be represented.)

In this case, at the time of Miano's conversations with AC & R employees, AC & R did not even have a full-time general counsel. Indeed, for much of the time it no longer even had a part-time general counsel, since Ken Simon left in November 1990. Moreover, Miano's termination was never even discussed with him, no less referred to him for legal assistance. I agree with the court's conclusion in Hildenbrand, that the mere existence of general counsel, without any particular involvement in the matter in issue, is insufficient to render a corporation "represented". To conclude otherwise would almost always provide a "no contact zone" around employees of corporations and other entities, that would be unavailable to individual parties or litigants, even where an attorney-client relationship did not yet exist regarding the matter in issue. While organizational defendants are entitled to the same protections under DR 7–104 as are individuals, they are not entitled to greater protection.

The record reveals that any discussions related to Miano with outside counsel who did work for AC & R on an ad hoc basis, were de minimis; moreover, none of those individuals or firms provided any services to AC & R regarding Miano. Indeed, any argument by AC & R that it had an attorney-client relationship, relating to the Miano matter, with any of the various attorneys who did work for it, is belied by the fact that even when it was made the subject of EEOC charges by Miano, AC & R did not turn to any of those attorneys for assistance. It was the AKOO firm which was consulted regarding Miano, in January 1991, and they did not make their representation known until March of 1991. Under the circumstances, it is my conclusion that at least through January 14, 1991, when AKOO was consulted by AC & R and when the Complaint had yet to be filed in this action, none of the AC & R employees with whom Miano spoke were "represented" for purposes of the disciplinary rule. AC & R did not have an attorney-client relationship with any counsel with regard to the Miano matter, prior to AKOO's appearance, that was breached or interfered with by Meirowitz through Miano's conversa-

tions. *Cf. United States v. Jamil,* 546 F.Supp. 646, 657 (E.D.N.Y.1982), *rev'd on other grounds,* 707 F.2d 638 (2d Cir.1983).[12]

The Court need not address the question of whether any of Miano's conversations with AC & R employees after AKOO's retention, on January 14, 1991, transgressed the disciplinary rule since plaintiff does not intend to rely upon or offer any of the tapes of those conversations in evidence.[13]

### III. Did Counsel Circumvent the Disciplinary Rules By "Causing" Miano To Engage in and Tape Conversations With AC & R Employees?

Although most of the evidence and argument in this proceeding was related to the issue of whether Meirowitz "caused" Miano to engage in his *ex parte* conversations in violation of DR 7–104, that issue need not be decided. Since I have concluded that AC & R was not represented at the time of the conversations, there can have been no violation of DR 7–104. Nevertheless, the facts relating to Meirowitz's involvement in Miano's conversations with AC & R employees remain relevant and must be analyzed in the context of DR 1–102(A), and provide an alternative ground for the conclusion that DR 7–104(A) was not violated.

 As discussed above, defendant contends that even if the Court concludes that the tapes made by Miano should not be excluded as evidence because they did not involve *ex parte* conversations with a "represented party", they should be excluded because secret taping of conversations constitutes an independent breach of ethical obligations, regardless of whether the person taped was represented. DR 1–102(A)(4) prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation," including the taping of conversations, and DR 1–102(A)(2) provides that a lawyer shall not "circumvent a disciplinary rule through the actions of another." A lawyer's client is "another" for purposes of the disciplinary rules. *Cf.* Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York, Formal Opinion No. 1991–2 (April 30, 1991) (hereinafter "N.Y.C. Formal Opinion No. 1991–2"), at 3. Thus, if Meirowitz circumvented DR 1–102(A)(4) through Miano, it is argued that the tapes should be excluded.

There is little authority which specifically addresses when an attorney is considered to have "circumvented" a disciplinary rule through the actions of another. However, DR 7–104 is an example of a rule that appears to explicitly incorporate the concept of "circumvention" by not only prohibiting an attorney from engaging in *ex parte* communications, but also prohibiting him/her from "caus[ing] another" to engage in such communications. Because there is some authori-

12. I recognize that the rules should not permit an attorney to remain "willfully ignorant" of another party's representation. However, given the fact that AC & R was not actually represented in this matter before January of 1991, and Meirowitz himself was not interviewing AC & R employees or misleading them as to his identity, there is no need to address the questions of whether Meirowitz had an obligation to do more to inform himself of whether AC & R was represented or to advise AC & R's employees of who he was and why they were being spoken to. Miano spoke with AC & R's employees; they knew who he was and that he had been terminated by AC & R. *Cf. W.T. Grant,* 531 F.2d at 674 (citing Informal Opinion No. 908 of the Standing Committee on Professional Ethics of the ABA (Feb. 24, 1966)) ("[i]t is not unethical behavior for a potential plaintiff's attorney to interview a potential defendant so long as the latter knows that the statement is being taken by the lawyer in his status as attorney for the plaintiff"); *Federal Saving and Loan Insurance Corp. v. Hildenbrand,* 1989 WL 107377 at *4 (attorney has no duty to inquire whether a person has legal counsel in matter in question and need not warn each person interviewed that they may be sued; in this case attorney identified himself, his client and the general purpose of the interview); New York State Bar Association Committee on Professional Ethics, Opinion No. 607, 1990 WL 304225 (N.Y.St.B.A.Comm.Prof.Eth., February 15, 1990) (to prevent willful ignorance of opposing party's representation, lawyer who communicates with party should tell him that communication should be referred to counsel if represented.)

13. The only conversation subsequent to January 14, 1991 upon which plaintiffs do seek to rely is that between Michael Widener and Robert Woodworth, on April 17, 1991. However, as set forth *supra,* at the time of the conversation Woodworth was no longer an employee of AC & R and would not be considered a "party" for purposes of the rule. Moreover, there was no evidence that Meirowitz was involved in, suggested or directed that encounter. 8/13/92 HT at 163–64.

ty available which attempts to give definition to what "causing another to act" means in the context of DR 7–104(A)(1), I find it relevant and helpful to consider that authority in determining whether Meirowitz can be said to have "circumvented" DR 1–102(A)(4) through Miano.

I note, however, that neither of these terms is susceptible of precise definition, and by necessity resolution of this issue requires an *ad hoc* determination based upon the facts of each particular case. Further, because the disciplinary rules do not have the force of law, but are intended to embody principles for the conduct of attorneys, when they are invoked in litigation a court is

> [N]ot constrained to read the rules literally or effectuate the intent of the drafters, but [should] look to the rules as guidelines to be applied with due regard to the broad range of interests at stake. 'When we agree that the Code applies in an equitable manner to a matter before us, we should not hesitate to enforce it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned'.

*Niesig v. Team I,* 76 N.Y.2d at 369, 559 N.Y.S.2d at 495, 558 N.E.2d at 1032 (quoting *Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1360 (2d Cir.1975) (Gurfein, J. concurring)).

■ Obviously, when an attorney actually requests or engineers a contact or action by another that would otherwise be prohibited by the disciplinary rules, he or she can be deemed to have "caused" it and to have "circumvented" the rule. An attorney cannot legitimately delegate to another what he himself is prohibited from doing, nor may he use another as his alter ego. *See Contini v. Hyundai Motor Co.,* No. 90–3547, 1991 WL 274465, at *3–4 (S.D.N.Y. December 10, 1991); N.Y.C. Formal Opinion No. 1991–2 at 6–8; *Cf. United States v. Jamil,* 707 F.2d at 646; *United States v. Massiah,* 307 F.2d 62, 66 (2d Cir.1962), *rev'd on other grounds,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (even where criminal defendant was represented, at pre-indictment stage government investigators could properly initiate contacts with him as long as they were not acting as the alter ego of the prosecutor).

■ There is an argument to be made, however, that the constraints on an attorney must go even further, so as to address the situation where he or she does not explicitly instruct another to act but accomplishes the same result indirectly. Therefore, as the Committee on Professional and Judicial Ethics of the New York City Bar Association concluded in the context of DR 7–104(A)(1), "causing" a client to communicate with another party

> ... includes not just using the client as an agent or in the place of the lawyer for making the communication (*i.e.* where the lawyer directs, supervises or plans the substance of the communication), but also the act of suggesting or recommending to the client that he or she engage in such communication, even though the lawyer has no further involvement in or knowledge of the substance of the communication that subsequently takes place, or the endorsement or encouragement of such a course of action, even when it is first raised or proposed by the client.... [T]he lawyer can still in fact "cause" the client to communicate by observing or advising that it might be desirable for the client to ... speak to the adverse party, if the lawyer's action is a material factor in the client's final decision to engage in such a communication.

N.Y.C. Formal Opinion No. 1991–2, at 7.

In assessing whether an attorney's acts or words were a material factor in the client's decision, the Committee suggested a focus "not on the client's actual recognized subjective decision-making process, but instead on whether the lawyer's words and actions would reasonably be understood to suggest or encourage that the client engage in the communication." *Id.,* n. 4.

■ The Committee recognized that, as a practical matter, the elimination of any ambiguity as to whether a lawyer encouraged a client's actions requires placing an affirmative obligation on the attorney to dissuade or prevent the client from acting; however, it declined to do so. It reasoned that parties have a right to deal directly with each other and without the consent of an attorney, and

that there is nothing in the disciplinary rules which restricts a client's right to act independently in initiating communications with the other side, or which requires that lawyers prevent or attempt to discourage such conduct. *Id.* at 5–6; *see also* Comment to ABA Model Rule 4.2 ("parties to a matter may communicate directly with each other"); ABA Formal Opinion 84–350 (1984) (withdrawing Formal Opinion 75 and Informal Opinion 524, both of which required lawyers to discourage client-initiated contacts with an adverse party). Thus, where a client directly asks his or her attorney whether he should approach a represented adversary, the attorney may not ethically recommend or endorse such action. Nevertheless, according to the New York City Bar Association Opinion, the lawyer may inform the client that such communication is not prohibited as long as the client independently decides to undertake the contact.

 Similarly, it is not improper for an attorney to advise his client of the legality of taping activity by the client. *See* New York State Bar Association Committee on Professional Ethics, Opinion No. 515, 1979 WL 15770 (N.Y.St.B.A.Comm.Prof.Eth.1979). The lawyer need not discourage or deter such activity, but he also may not assist, direct or otherwise participate in it so that, in effect, he is using the client as a vehicle to do what he cannot do. *Cf.* N.Y.C. Formal Opinion No. 1991–2, at 7; *see also* ABA/BNA Lawyer's Manual on Professional Conduct, 71:301–71:303 (1988).

 Although bar opinions are not binding on this Court, they are instructive in applying ethical rules to attorney conduct in litigation and provide guidance to attorneys themselves in conforming their conduct to ethical proscriptions. If attorneys' violations of ethical rules are to have implications for litigation, as well as their own disciplinary status, the standards against which their conduct is to be measured should be consistent and clear. Nevertheless, even with the principles set forth in N.Y.C. Formal Opinion No. 1991–2, difficult questions remain as to when an attorney's conduct vis-à-vis his/her client can be deemed "encouragement" or "endorsement" of activity prohibited to the at-

torney, or circumvention of the disciplinary rules; this is particularly so when an attorney is aware of client initiated contact or taping activity, need not stop it and, indeed, may advise the client as to what he/she can do legally. The instant case represents a prime example of the murky ethical realm in which attorneys and courts can find themselves when pre-litigation adversarial contact is initiated and taped by a client, but with knowledge of the attorney.

In this case, defendant contends that Mr. Meirowitz actually engineered and, in any event, assisted and encouraged his client's taped conversations with high-level employees of the defendant. Based upon the initial testimony given by Miano at his deposition, there was good reason to reach this conclusion. However, Miano subsequently corrected portions of his deposition and he and his counsel submitted further affidavits explaining their conduct. These submissions rebutted certain of defendant's original assumptions, but ambiguities remained which were difficult to resolve simply on paper submissions. Consequently, an evidentiary hearing was held. Having considered all of the evidence, much of which required an assessment of the witnesses' credibility, the following are my conclusions of fact.

### A. The Period Between May and October 1990

 Shortly after Miano was terminated, on May 15, 1990, he had a conversation with Harry Koenig, Vice–Chairman and Chief Financial Officer of AC & R, and a long time colleague of Miano's, in which Koenig gave him reason to believe he had been fired for age-related reasons; Koenig thought his termination might merit litigation.

In early August 1990, Miano contacted Richard Meirowitz, an attorney whom he had met socially several years earlier. They had two telephone conversations in which Miano sought advice about the legality of tape-recording conversations with other parties. 9/16/92 HT at 14–16, 30. During these conversations, Meirowitz advised Miano that it was legal in New York to tape a conversation to which Miano was a party, without divulging to the other party the fact of the taping.

8/13/92 HT at 8–9. Miano asked Meirowitz how. to go about taping a conversation and Meirowitz suggested that he contact a private investigative firm with which Meirowitz was acquainted—Business Risks International ("BRI"). Meirowitz offered to contact the firm for him since Meirowitz had met BRI'S regional manager, John Good, at a social function. Meirowitz informed Good that Miano wanted assistance in taping and transcribing conversations. 8/13/92 HT at 10–12. On August 7, 1990, a BRI employee, Stephen Berk, met Miano at Meirowitz's office. After introductions, Berk and Miano spoke on their own for a few minutes about the assistance Miano needed. Meirowitz had no further contact with Berk.

Neither Miano nor Meirowitz discussed the issues Miano was investigating with any of the BRI staff, since BRI was not being asked to play an investigative role. However, a substantial dispute exists as to what Meirowitz and Miano discussed regarding the subject of the proposed tapings.

At his deposition in this action, Miano testified that he retained Meirowitz in August 1990, prior to initiating his tape-recording activities on August 28, 1990. Miano Deposition Transcript, dated May 28, 1991, at 111; November 21, 1991 Dep. Tr. at 516, 517. Subsequently, Miano made changes or corrections in his deposition testimony, through attached *errata* sheets. He revised his testimony to state that he did not retain Meirowitz until October 3, 1990, the date he signed a formal retainer agreement. At his deposition, when questioned about the substance of his August conversations with Meirowitz, Miano declined to respond, invoking the attorney-client privilege. However, after the instant motion was filed and the substance of Meirowitz's and Miano's conversations was put directly in issue, Miano and Meirowitz submitted affidavits which essentially stated that Meirowitz was not retained in this matter until October 3, 1990, after Miano began his taping activities, and that their earlier

contacts, in August 1990, involved "counselling" or "representation" on an unrelated matter. See Affidavit of Louis Miano, dated May 8, 1992, ¶¶ 5–6; Affidavit of Richard Meirowitz, dated May 8, 1992, ¶ 3. The subject of that counselling was described in supplemental affidavits as involving a dispute Miano was having with the board and managing agent of the cooperative corporation where he lived. *See* Supplemental Affidavit of Louis Miano, dated July 6, 1992, ¶ 3; Supplemental Affidavit of Richard Meirowitz, dated July 6, 1992, ¶ 4. Miano and Meirowitz testified about Miano's housing dispute in some detail at the hearing on this motion.[14] 8/13/92 HT at 7–8, 18–21, 28, 66; 9/16/92 HT at 18–22, 116–21, 123–28.

Thus, Miano's initial deposition testimony reasonably gave rise to the following assumptions on defendant's part: (1) that when Meirowitz and Miano met in August 1990, Meirowitz was retained as an attorney on this matter; (2) he advised Miano as to his right to tape conversations related to this matter; and (3) with Meirowitz's assistance, taping activity began. Those assumptions, however, were subsequently undermined by plaintiff's testimony and sworn statements to the effect that: (1) Miano spoke to Meirowitz in August of 1990 only about his co-op problems and, in that context, Meirowitz advised him of his right to tape conversations and referred him to BRI (9/16/92 HT at 20–21); (2) from that point onward, Miano, not Meirowitz, dealt directly with BRI for taping assistance; (3) in late August 1990, Miano on his own decided it would be in his interest to tape record conversations with AC & R employees in connection with a potential age discrimination claim (9/16/92 HT at 30–31); (4) it was only after having several conversations with AC & R employees, which yielded what was perceived to be strongly supportive evidence, that Miano decided to bring the age discrimination claim to Meirowitz's attention (9/16/92 HT at 35–38); (5) that he did so for the first time on October 3, 1990, when he

---

14. Miano testified that when he said at his deposition that he retained Meirowitz in August 1990, he was thinking of his consulting him on his housing problems, and he was mistaken as to the date of Meirowitz's retention on this matter. 9/16/92 HT at 29–31. At the hearing in this

matter, Miano testified that after reviewing the retainer agreement and his check stubs, he realized that the date he retained Meirowitz was October 3, 1990. *See* Plaintiffs' Hearing Exhibit 5; 9/16/92 HT at 114.

actually retained Meirowitz (9/16/92 HT at 90); (6) Meirowitz first learned of Miano's taping activity relating to AC & R on October 3, 1990 (*Id.;* 8/13/92 HT at 45–46); (7) the decision to tape was entirely Miano's, arrived at before he consulted Meirowitz on this matter (9/16/92 HT at 33–34, 88–89); (8) Meirowitz never advised, counseled or coached Miano regarding with whom he should speak or what to ask them (*Id.* at 89–90).

Defendant argues that Miano's and Meirowitz's testimony is not credible and that there is evidence, in addition to Miano's initial deposition testimony, which strongly suggests that it was contrived. First, defendant points out that Miano corrected his deposition testimony after he knew that AC & R was challenging the admissibility of the tape recordings. While that may be true, Miano did not receive the transcripts of his deposition until some time in April or May 1992, and many of his corrections were made shortly thereafter, when the instant motion had already been filed. 8/13/92 HT at 40–41, 57–59.

Defendant also points out that although Miano claims he spoke to Meirowitz in August about his co-op difficulties and the possibility of taping conversations, he in fact made no such tapes and only taped conversations related to this action. Miano's explanation is that he attempted to tape record conversations with an employee of his building management company but failed because of problems with the equipment.[15] 9/16/92 HT at 26–28; *see also,* 8/13/92 HT at 29. Although a question arises as to why Miano was so easily discouraged from pursuing the housing matter on which he purportedly sought Meirowitz's and BRI's assistance, he explained that he subsequently traveled to California to pursue leads related to this action and that his concerns about his housing matter abated as he began dealing with building personnel who were more accommodating and responsive. 9/16/92 HT at 123–128. Miano and Meirowitz testified credibly and in some detail about Miano's co-op difficulties and their being the only subject they discussed in Au-

gust 1990. 8/13/92 HT at 7–8, 19–20, 28, 66; 9/16/92 HT at 18–22; 116–121, 123–128. Although Miano, on his own, began taping conversations with AC & R employees in late August and September 1990, there is no significant evidence to support the conclusion that he discussed or planned that taping with Meirowitz, and I cannot conclude that the testimony regarding his co-op was a contrived, after-the-fact cover-up.

Defendant further argues that Miano's and Meirowitz's credibility was seriously undermined by significant inconsistencies, omissions and concealments regarding BRI's billing for its services and Meirowitz's involvement with that billing. The evidence relating to BRI's billing was also offered to prove Meirowitz's continued involvement in Miano's clandestine taping activity and *ex parte* conversations.

In its initial submissions with this motion, defendant suggested that Meirowitz may have actually paid some of BRI's tape transcription bills. This apparently arose as an issue because, at his deposition, Miano testified that Meirowitz paid some of the first BRI bills, and later corrected his deposition to state that Meirowitz did not pay any of the bills. Miano Deposition Transcript, dated April 2, 1992, at 1199, 1208, 1213, and errata sheet. In fact, there is no evidence that anyone but Miano paid the BRI bills.

Miano's initial confusion may be attributed to some error or misunderstanding on BRI's part. Defendant made much of the fact that on its initial invoices, BRI listed Meirowitz as the "client". This, however, does not demonstrate the Meirowitz was the actual client, that he paid the bills, or that he knew, prior to October 3, 1990, that Miano had taped conversations with AC & R employees. BRI's then regional manager, John Good, testified that it was normal procedure to list the referring attorney as the "client", rather than the·attorney's client. 8/11/92 HT at 160–61. This was done on Good's instruction. When Meirowitz first called Good, they had only a brief conversation in which Meirowitz indicated that he had an individual who needed taping assistance. The subject of

---

**15.** A BRI employee, William Frawley, ·testified that he actually did replace Miano's taping equipment several times, lending some support to Miano's explanation. 8/11/92 HT at 105–06.

that activity was never discussed and Meirowitz and Good never spoke again. 8/13/92 HT at 11–12; 8/11/92 HT at 143, 164. In all of his dealings on this matter, William Frawley, the relevant BRI staff person, dealt only with Miano and never with Meirowitz. 8/11/92 HT at 104, 115, 119. In fact, the BRI Case Activity Sheets, which listed Meirowitz as the client, also referred to Miano as "the client" when describing work done, such as visits to his home. *See, e.g.,* Defendant's Hearing Exhibits III, JJJ, KKK; 8/11/92 HT at 123–24.

Because Meirowitz was listed as the "client", initially BRI bills went directly to him. Defendant places much emphasis on the fact that BRI's first two invoices, dated September 4 and October 8, 1990, were addressed to Meirowitz. *See* Hearing Exhibits IIII and JJJJ. It argues that if Meirowitz received an invoice for taping activity shortly after September 4, 1990, it would contradict his testimony and his July 6, 1992 Affidavit, ¶ 5, where he swore that he first learned of Miano's taping of AC & R employees on October 3, 1990, when Miano met with him and formally retained him on this matter. However, in his July 6th Affidavit, and at trial, Meirowitz also testified that he did not receive BRI's September 4 and October 8, 1990 invoices until October 23, 1990. 8/13/92 HT at 52, 54–55. When he received them, he instructed the BRI billing employee, Ann Creighton, to address future bills to Miano and to provide a breakdown and itemization of the invoices. 8/13/92 HT at 87; Hearing Ex. HHHHH. The revised September and October invoices were received on November 6, 1990. 8/13/92 HT at 113–15. However, despite Meirowitz's purported instruction to Creighton to send future bills to Miano, the November and December bills also went to Meirowitz. It was only in January 1991, that

BRI changed its records to list Miano as the client, so that the bills went directly to him.[16]

While it is not unreasonable on defendant's part to assume that BRI's September 4th invoice was received by Meirowitz some time in September, there is no actual proof to contradict Meirowitz's testimony that he received the September and October bills on October 23. Moreover, given Meirowitz's documented concerns that the September and October bills were not sufficiently itemized, it is fair to assume that had he received the September 4th invoice in September, he would have then made the request to BRI to provide a more detailed breakdown of costs. Yet, he did not make such a request until October 23, *see* Hearing Ex. HHHHH, which is the date he contends he actually received the invoices.[17]

Finally, defendant submitted the declaration of Jerome Bess, the former chairman of AC & R, in which he asserted that in a conversation with Miano, Miano stated that he was advised to tape his conversations by counsel. Bess testified at the hearing. Miano and Bess had two telephone conversations which Miano taped—one on December 17, 1990 and the second on March 29, 1991. Bess acknowledged that Miano had stated that Harry Koenig, AC & R's Vice–Chairman, suggested that Miano call him. During the conversations, Miano made Bess aware of his proceedings against AC & R, and Bess told Miano that he thought he had a strong case. 9/16/92 HT at 162, 165. Bess did not know he was being taped. When he later learned of the tapings from AC & R's counsel, he telephoned Miano, in April 1991, to question him about the taping. Bess testified that Miano stated that he had been advised to tape; although, in his declaration Bess stated that "to the best of his recollection Miano said that he was advised by his counsel to tape record his conversations . . .",

---

**16.** Supportive of Meirowitz's testimony that he instructed BRI to bill Miano directly in late October, is his November 12, 1990 letter to Miano, sent after Meirowitz received more bills, asking Miano to advise BRI to bill him directly. Defendant's Hearing Ex. SSSS.

**17.** Even if Meirowitz had received the BRI September 4th invoice in September, that would not prove that he was aware of *ex parte* taping activity related to this action prior to October 3, 1990,

when he contends Miano told him of the taping. The September 4th invoice does not indicate the subject of the taping activity. Moreover, it relates to services incurred through August 24, 1990. *See* Hearing Ex. B. In fact, Miano did not make the first tape related to this action until August 28, 1990. The invoice could have just as reasonably been understood to relate to BRI's work for Miano on his housing problems.

at the hearing he could not be sure Miano ever used the words "by his counsel". 9/16/92 HT at 171–72.

Miano testified that he never stated to Bess that he had been advised by his counsel to tape record the conversations. He said that he had been advised that it was legal to tape. 9/16/92 HT at 35, 111.

In sum, while there is circumstantial evidence which raises questions about a number of details in Miano's and Meirowitz's testimony, I cannot conclude that their testimony was not credible in its entirety or that the evidence affirmatively proves that Meirowitz suggested, advised, or supervised the *ex parte* taping and conversations that occurred between August 28 and October 3, 1990, when he was formally retained. There is thus no basis for excluding as evidence the taped conversations with AC & R employees which occurred up to that date.

### B. Post–October 1990 Tapings

 Having concluded that there is no basis on which to conclude that Meirowitz initiated Miano's taping of conversations with AC & R employees, I turn now to the question of whether at some later point in his representation of Miano, Meirowitz circumvented DR 1–102(A)(4) by "causing" or "encouraging" Miano to continue his taping activities. On October 3, 1990, Miano met with Meirowitz and informed him of his termination from AC & R and of the facts which he had secured that gave him reason to believe he might have the basis for a lawsuit. He acknowledges having told Meirowitz of recording three conversations, two with Harry Koenig on August 29, 1990 and September 25, 1990, and the other with Patrick King, President of AC & R, on October 1, 1990. 9/16/92 HT at 36–37, 90. These conversations confirmed Miano's suspicions that age had been a factor in his termination. He had been given some details of the meeting in California where Stephen Rose, CEO of AC & R, purportedly made age-related remarks about Miano and others. According to Miano, Koenig suggested that he contact members of the AC & R Management and Executive Committees who had been at the meetings, or who were in New York; Koenig suggested that he gather other evidence, and Koenig suggested that he consult an attorney. *Id.* at 58, 61, 84, 94–99.

After spending the morning of October 3, 1990 providing these details to Meirowitz, that afternoon Miano signed a retainer agreement. According to Miano, while Meirowitz may have indicated that he was "intrigued" by the evidence Miano had gathered, he never directed Miano to engage in other conversations or tapings. 9/16/92 HT at 41–43. While Miano may have told Meirowitz he was going to speak to other AC & R employees, specifics were never discussed, Meirowitz never suggested it, and Miano never told Meirowitz of plans to tape further conversations. 8/13/92 HT at 49, 111; 9/16/92 HT at 132–34. During the week after their October 3rd meeting, Meirowitz and Miano continued to speak on the telephone, with Miano providing more details he had received from Koenig.

Miano continued to tape conversations with AC & R employees in the months that followed. For the most part, the people he chose to speak with were those who Koenig, of AC & R, suggested would have useful information. 9/16/92 HT at 107–09. Meirowitz was aware that Miano had further conversations with AC & R employees, although he and Miano testified that they never discussed Miano's prospective plans to speak to other AC & R employees. 8/13/92 HT at 129–30. Meirowitz acknowledged at the hearing that he probably indicated in his conversations with Miano that certain information was useful. 8/13/92 HT at 77–85. Meirowitz did not directly discuss taping activity with Miano; he did not advise him to tape or not to tape, and was generally unaware of whether specific information Miano was providing had actually been taped.[18] 8/13/92 HT at 77, 110–112, 159. Miano did not ask, or discuss with Meirowitz, whether it would be useful to make tapes. Miano's last taped conversation

---

18. Meirowitz first received draft transcripts of the tapes several months into 1991. He did not receive or listen to any of the tapes until May of 1991, after the taping activity had ceased. 8/13/92 HT at 140–146.

with an AC & R employee occurred on April 18th.

The only other evidence which relates to Miano's motivation in speaking to and taping conversations with AC & R employees involves Harry Koenig, AC & R's Vice–Chairman. Miano testified at length about his meetings and conversations with Koenig, the first one dating back to May 1990, shortly after Miano was terminated and well before he ever spoke to Meirowitz. Koenig told Miano about the AC & R Management Committee meeting in California and gave him reason to believe that AC & R's CEO made age-related remarks about Miano and others at the meeting, and that Miano's termination was age-related. Koenig suggested that Miano speak to a list of AC & R employees in California and New York, who could provide more information. Koenig encouraged Miano to bring suit and suggested he could help. Indeed, Koenig suggested that Miano consult an attorney, and went so far as to suggest his seeing Koenig's daughter, who was a labor lawyer.[19] According to Miano, it was Koenig's suggestions and encouragement, as well as his own interest and curiosity, which caused him to speak to AC & R employees and to tape many of the conversations. 9/16/92 HT at 41–42, 55–59, 83–84, 93–102, 130–39.

Koenig testified at the hearing as well. He confirmed that he informed Miano in May 1990, shortly after he was fired, of what occurred at the AC & R meeting in Irvine, California and that he suggested that if he wanted more information he should discuss the meeting with other AC & R employees who were present; he named at least some of them specifically. 8/11/92 HT at 158–163. Koenig also testified that he suggested to Miano various documents he thought it would be helpful to subpoena from AC & R, Id. at 164–65, and it was Koenig who suggested

that Miano speak to Alvin Chereskin, the Chairman of AC & R, on January 3, 1991.[20] Id. at 184.

As with Miano's activity before he retained Meirowitz as counsel, on October 3, 1990, there is little or no evidence to support the conclusion that Miano's later taped conversations with AC & R employees were directed, planned or suggested by Meirowitz. Meirowitz did not engineer or arrange them. Compare United States v. Hammad, 678 F.Supp. at 399; 858 F.2d at 837 (prosecutor directed informant to arrange and record a meeting with a represented party and provided the informant with a sham subpoena to mislead the represented party). There is also no evidence that Meirowitz ever advised Miano either as to the substance of his conversations with the AC & R employees or as to whom he should speak. In fact, virtually all of the people with whom Miano spoke had been suggested by Harry Koenig. Cf. United States v. Buda, 718 F.Supp. 1094 (W.D.N.Y.1989) (where Assistant United States Attorney knew defendant was represented and did nothing more than acquiesce in wiring and recording of informant's conversation with defendant, but in no way attempted to direct the content of the conversation so as to beguile defendant in to giving his case away, no violation of DR 7–104(A)(1) and evidence not suppressed.)

Nevertheless, this is also not a case where Meirowitz can credibly claim that he was not even aware of Miano's conversations with AC & R employees or his taping activity, or that he specifically directed him not to engage in such activity. Compare Contini v. Hyundai Motor Co., 1991 WL 274465 at *3; United States v. Jamil, 707 F.2d at 645–46. Rather, over the course of several months, Miano reported to Meirowitz on the fruits of his conversations with AC & R employees and, even if Meirowitz did not specifically discuss

---

19. In addition to being a Vice–Chairman of AC & R, Koenig told Miano that he had a legal background and, in fact, that he attended and graduated from law school. 9/16/92 HT at 91–92. Indeed, Miano believed Koenig to be a lawyer. Koenig's testimony on this subject was equivocal and, in any event, he did not clearly deny that he made such representations. 8/11/92 HT at 97–98.

20. Koenig actually transferred Miano to Chereskin's telephone line. The Chereskin conversation was taped and is in issue. 9/16/92 HT at 100–102. Indeed, the January 3, 1991 conversation with Koenig, which was taped, was actually initiated by Koenig and not Miano. Id. Two other taped conversations, with Mr. King, in April 1991 and Ms. Amorelli, in November 1990, were not initiated by Miano. Id.

future conversations Miano intended to undertake or tape, it is fair to assume that he was aware Miano would continue to engage in such activity in the future.

█ Meirowitz's ongoing discussions and receipt of information from Miano, derived from taped conversations, presents a troubling and close ethical question—whether Meirowitz was so embroiled in Miano's conduct so as to be considered to have circumvented the disciplinary rules through Miano. There obviously would be less ambiguity with respect to an attorney's ethical obligations in a situation such as existed in this case, if it was clear that attorneys are either required to control their clients' behavior or so completely disassociate themselves from the clients' behavior so as to preclude any discussion with clients of what action they contemplate or are engaged in. Nevertheless, that is not clearly expected. Ethics opinions allow that attorneys need not prevent clients from engaging in *ex parte* or taped conversations with adversaries, and are permitted to counsel clients regarding the scope and ramifications of such conduct. *See* ABA Formal Opinion 84–350 (1984); N.Y.C. Formal Opinion No. 1991–2; NYSBA Opinion No. 515 (1979) (counsel is not limited to restating the law, but may "explain to the client whether in the particular context such monitoring is appropriate, having regard to its purpose, the parties involved, the time and place, the extent and nature of the conversation likely to be recorded, possible harmful social consequences and other pertinent considerations").[21] While the attorney's subsequent receipt and use of information secured by the client goes a step further, logic dictates that if the information was not secured illegally or unethically, its use does not place the attorney in violation of the disciplinary rules. *Cf. United States v. Jamil,* 707 F.2d at 646 ("We reject appellee's contention that the introduction of the tapes in evidence by the prosecutor would constitute a violation of DR 7–104(A)(1). Such a holding would bar prosecutors from utilizing the fruits of government investigations which are found to be lawfully conducted.").

█ Here, Meirowitz did not suggest, plan or supervise what Miano was doing, and what Miano was doing was not illegal. While it might have been desirable for Meirowitz to explore with Miano the moral implications of his actions, his failure to do so did not render his conduct clearly unethical. Although I believe Meirowitz came perilously close to crossing the line of circumventing the disciplinary rules through the actions of Miano, and Meirowitz would have been better advised to have further distanced himself from Miano's undertakings, I am not prepared to conclude that Meirowitz's knowledge of Miano's activity or receipt of information from Miano placed Meirowitz in violation of the disciplinary rules. When a client independently and legally secures information which is relevant and useful to his case and provides it to counsel, the attorney's use of that information is not unethical. The evidence does not support the conclusion that Meirowitz "caused" Miano's behavior or "used" Miano to circumvent the disciplinary rules.[22]

█ I would further note that even if Miano's taping activity could be attributed to Meirowitz, it is not at all clear that suppres-

---

**21.** As the New York City Bar Ethics Committee observed, while it would be more difficult for a lawyer to circumvent the disciplinary rules if he could not discuss the subject of his client's communications with the client at all, that could have the effect of unnecessarily curtailing the assistance of counsel available to a client. N.Y.C. Formal Opinion No. 1991–2, n. 4.

**22.** While it might be argued that Meirowitz's receipt of, and interest in, the information which Miano secured "encouraged" Miano in some way to continue his activities, on the facts of this case I must conclude that any such encourage-ment was both indirect and marginal. Miano initiated his contacts with AC & R employees before he ever spoke to Meirowitz. He was truly encouraged to do so by Harry Koenig, AC & R's Vice–Chairman. Miano is a sophisticated businessman and the relevance and usefulness of the information Koenig provided to him was apparent. That he followed through on Koenig's leads, subsequently provided that information to Meirowitz and received confirmation that it was useful, should not place Meirowitz in violation of the disciplinary rules for having "encouraged" Miano's conduct.

sion of the tapes as evidence would be an appropriate remedy. Although the Second Circuit has allowed that suppression of evidence is an acceptable weapon in the arsenal against unethical conduct, it is by no means mandated. Rather, the Court of Appeals recognized that a court's discretion to suppress evidence should be exercised cautiously. *United States v. Hammad*, 858 F.2d at 840. In the context of DR 7–104(A)(1), in which *Hammad* arose, it is readily apparent how an attorney's *ex parte* discussion with a represented party could seriously prejudice the party and taint the trial. The purpose of the rule is to protect a party from the superior knowledge and skill of an attorney in securing uncounseled statements and attorney-client confidences.[23]

■ The interests served by the rule against clandestine taping are different. Its primary concern is with an attorney's status as a member of the bar and expectations of conduct in dealing with others that flow from that status, *i.e.*, candor and honesty. While no less important, these interests are more appropriately monitored and enforced through disciplinary bodies rather than trial courts. *Cf. W.T. Grant v. Haines*, 531 F.2d at 677; *Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. at 1083 ("Different ethical rules warrant different cures when breached."). There is little reason to believe that Miano's taping of the AC & R employees' conversations affected, in any way, the substance of what they said.[24] The information they provided was not the result of an attorney's overbearing behavior or superior skills. The admission of these tapes at trial would therefore not result in serious prejudice to any party or significantly taint the trial.

CONCLUSION

For the foregoing reasons, I conclude that the tapes of conversations with defendant's employees, secured by plaintiffs Miano and Widener, were not the fruits of ethical violations by plaintiffs' counsel, and should not be precluded as evidence. Defendant's motion is therefore denied.

*Appendix A—Tape Recorded Conversations In Issue*

| Tape No. | Parties | Date |
| --- | --- | --- |
| 1 | Miano/Koenig | August 28, 1990 |
| 2 | Miano/Koenig | September 25, 1990 |
| 11 | Miano/Yusi | November 9, 1990 |
| 13 | Miano/Koenig | November 13, 1990 |
| 15 | Miano/Wilson | November 14, 1990 |
| 17 | Miano/Gerken | November 16, 1990 |
| 18 | Miano/Amorelli | November 16, 1990 |
| 21 | Miano/Koenig | December 17, 1990 |
| 22 | Miano/Koenig | January 3, 1991 |
| 22 | Miano/Chereskin | January 3, 1991 |
| 22 | Miano/Amorelli | January 3, 1991 |
| 23 | Miano/Johnson | January 3, 1991 |
| 25 | Miano/Koenig | January 3, 1991 |
| 26 | Miano/Livingston | January 3, 1991 |
| 26 | Miano/Yusi | January 3, 1991 |
| 27 | Miano/Royce | January 11, 1991 |
| 33 | Widener/Woodworth | April 17, 1991 |

**23.** The facts of this case do not suggest that any of the AC & R employees with whom Miano spoke were taken advantage of by Meirowitz's skills as an attorney. He did not speak with them or guide Miano in his questioning. Additionally, there is no evidence that the information Miano secured breached attorney-client communications at AC & R.

**24.** It appears that there is deposition testimony by most of the AC & R employees whose conversations were taped, which substantially parallels what they said directly to Miano.