Elouise Pepion COBELL,
et al., Plaintiffs,

v.

Gale A. NORTON, Secretary of the Interior, et al., Defendants.

No. CIV.A. 96–1285 (RCL).

United States District Court,
District of Columbia.

March 3, 2003.

**MEMORANDUM AND ORDER**

LAMBERTH, District Judge.

This matter comes before the Court on defendants' motion for reconsideration of the Court's December 23, 2002 order prohibiting communications with class members pursuant to Rule 23(d) of the Federal Rules of Civil Procedure [1715–1], which was filed on January 8, 2003. Upon consideration of defendants' motion, defendants' reply brief,[1]

---

1. Defendants have moved to strike plaintiffs' op-     position brief as untimely filed. In a separate

and the applicable law in this case, the Court finds that defendants' motion should be denied.

■■■ Defendants have brought this motion under Rule 59(e) of the Federal Rules of Civil Procedure, which provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." However, the December 23 order was not a final judgment by this Court, but an interlocutory order. Defendants suggest that the Court construe defendants' motion as having been brought under to the Court's inherent power to reconsider its own interlocutory orders. Defs.' Reply Br. at 2. Defendants cite the following observations made by this Court in a memorandum and order dated September 17, 2002:

> District courts have broad discretion to grant or deny a motion for reconsideration. The court may invoke its discretion and deny such a motion unless it finds an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice.

*Cobell v. Norton,* 226 F.Supp.2d 175, 177 (D.D.C.2002) (citations omitted). However, defendants have failed to direct this Court to any relevant changes in the law since December 23, proffered any new evidence, or convinced the Court that reconsideration of its order is necessary to correct a clear error or manifest injustice. Instead, defendants absurdly maintain that the notices in the account statements they mailed to class members did not constitute communications concerning the subject matter of the representation. Defendants also announce to this Court that, despite having found reliable evidence indicating that defense counsel violated ethics rules through its participation in the efforts to produce the account statements, its referral of defense counsel to the Disciplinary Panel is "without foundation." Interior Defs.' Mot. for Reconsideration of Order Prohibiting Communications with Class Members ("Mot. to Reconsider") at 3.

But the only thing that defendants' motion demonstrates is that defendants have funda-

mentally misunderstood this Court's December 23 opinion. In order to avoid further misunderstanding, the Court will explain the findings of fact and the legal conclusions that it made in that opinion.

The first paragraph of the notices that defendants mailed to the class members declared that "DOI's Office of Historical Trust Accounting (OHTA) recently performed an accounting of this account from the time it was open through December 31, 2000." Under the heading *"What You Should Do Next,"* the notice repeated that "OHTA completed the enclosed Historical Statement of Account for the time from the opening of the account through December 31, 2000," and then announced:

> If you have concerns about the Historical Statement of Account included with this letter or if you believe it is in error, you may wish to file a challenge with OHTA . . . . . **If you do not challenge the historical account statement or request an extension within 60 calendar days of the postmark on the envelope containing this letter, the enclosed Historical Statement of Account will be final and cannot be appealed**. . . . You may appeal OHTA's final response to the Interior Board of Indian Appeals (IBIA) by filing a Notice of Appeal with IBIA within 30 calendar days of the date you receive OHTA's response. [emphasis in original].

Defendants now claim that "[t]he notification made clear that recipients could bring to Interior's attention any information they believed relevant within a sixty-day period. Following that period, Interior would treat the individual accountings as final, absent further orders in this litigation calling into question that validity of the accountings under applicable statutory standards." Mot. to Reconsider at 9. The Court will set aside for a moment the issue of whether defendants did not intend the notices to preclude judicial review of defendants' administrative proceedings, a statement that the Court finds extremely dubious. Regardless of defendants'

---

order issued this date, the Court granted defendants' motion to strike plaintiffs' opposition

brief.

purported intent, the fact remains that without having obtained the consent of the Court, defendants mailed notices to class members that affected the rights of the class members to a full and accurate historical accounting— the very claims that lie at the heart of Phase II of this litigation. Defendants thus altered the class members' rights to a full accounting by subjecting the historical statements of account that the members had received to an administrative appeals process, without having consulted the Court about the changes that defendants were proposing. Thus, even if the notices could be considered to be legally accurate, it was improper for defendants to have sent them without first obtaining the Court's approval.

But the notices, in fact, were not accurate because they failed to inform the class members of their rights in this litigation. In their supplemental opposition brief, defendants complain that it might have been "misleading" for them to have mentioned this litigation in the notices. Defs.' Supp. Opp. Br. at 8. But defendants were not without recourse in this matter. The proper course of action would have been for defendants to file a motion requesting an order from this Court finding that their proposed communications with class members would not violate the ethical rules prohibiting contact with represented parties, precisely as they did in March

2000 and December 2001, when administrative processes they were contemplating involved contacts with class members. Defendants could have waited until the Court had ruled on plaintiffs' motion for a temporary restraining order and preliminary injunction against the transmission of the account statements. At the very least, given that defendants purport to have had the best interest of the class members at heart, defendants could have consulted with class counsel about the notices they were planning to send out. It is true that defendants alleged that they were concerned about potential Privacy Act violations, but defendants nevertheless were too impatient to wait for this Court's ruling on their motion that had raised those concerns.[2]

In their supplemental opposition brief, defendants claim that their March 2000 and December 2001 motions were only filed "out of an abundance of caution." *Id.* at 3 n. 3. A dose of that caution would have served defendants well in this matter. Rather than filing a motion for an order permitting them to transmit the account statements, or even waiting for the Court to rule on the pending motions dealing with these statements, defendants went ahead and mailed out over a thousand statements to class members, so that they could issue a press statement laud-

---

**2.** Incredibly, rather than admit they had acted rashly by failing to wait for the Court to rule on this pending motion, defendants shifted the blame to plaintiffs' counsel and to the Court:

> MR. SELIGMAN: This is a situation where we weren't trying to go behind the Court's back or behind counsel's back. We—before they went out we went to plaintiffs' counsel and asked for their consent to our order, and we could have had this resolved at that time, but they refused to consent to it and said, "No, there's an issue with—the protective order is enough." But if they had just consented, then we would have had an order in place before these went out.
>
> THE COURT: But they didn't consent, so why didn't you let the Court rule on it before you acted?
>
> MR. SELIGMAN: Well, there was quite a bit of time went by, Your Honor.
>
> THE COURT: Well, you know, I'm in a murder trial with 31 murders. It's not like I have nothing to do but this Indian case.

Transcript of Motions Hearing, Nov. 1, 2002, at 17–18. In fact, the record of this case shows

that defendants waited all of thirteen days after their motion for an order permitting them to provide copies of the account statements to plaintiffs' counsel was ripe before mailing out the statements to the class members.

Nevertheless, defendants include the following as a "statement of fact" in their motion for reconsideration: "[P]laintiffs' counsel opposed Interior's motion and sought a temporary restraining order and a preliminary injunction preventing Interior from distributing these account statements on the ground that they would be misleading. . . . This Court did not rule on plaintiffs' request for injunctive relief." Mot. to Reconsider at 3–4. What defendants mean by this last sentence is unclear. Apparently, defendants are implying that if the Court does not rule on a motion within three weeks of the time that it was filed, defendants are free to conclude that the Court will not be ruling on the motion at ,all. The Court is admittedly intrigued by the implications of this theory of "judicial estoppel." The logical corollary of this argument is that because defendants have failed to act since 1887, the Court may assume that they will not act at all, and enter a default judgment for plaintiffs.

ing their own valiant efforts at trust reform. *See* Pls.' Notice of Supp. Authority in Support of Mot. for TRO and Prelim. Inj., Exh. 1. Indeed, in their surreply brief, defendants announce that "Interior opposes withholding the statements from the account holders while waiting for Court and Plaintiffs' counsel 'approval' of them." Defs.' Surreply at 6 n. 8. Defendants thus have only themselves to blame for the consequences of their impatience and obstinacy.

As noted above, defendants allege that the notices included with the account statements stating that the rights of the class members to appeal the account statements they had received would be lost unless the members objected within sixty days were never intended to supplant any remedy that the Court might order in Phase II of this litigation. The Court has just explained why defendants' purported intentions are irrelevant. But even assuming that these intentions mattered, the weight of the evidence suggests that defendants never intended these notices to be anything but an attempt to extinguish the rights of the class members without the possibility of judicial review. For one, their statements to this Court during oral argument contain not the slightest hint that any other message was ever intended. During the hearing on plaintiffs' motion for a preliminary injunction, the Court raised this very issue with defense counsel:

> THE COURT: Well, where did this regulation come in that they lose all their rights after 60 days once they get this? Where did that come up, then?
>
> MR. SELIGMAN: Well, my understanding is that there was already a procedure in place for appeals from Bureau of Indian Affairs' hearings, and the regulation that has been proposed now is basically to allow the Office of Hearings and Appeals to go ahead and hear these types of appeals, basically in an effort to try to narrow any possible disputes they might have. The typical—
>
> THE COURT: And to extinguish the rights of anybody that doesn't file the appeal in 60 days—
>
> MR. SELIGMAN: Well, I—

> THE COURT:—which are class members; right?
>
> MR. SELIGMAN: Well, yes.
>
> THE COURT: So you're going to have class members lose all their rights in 60 days with a notice from you with no notification to plaintiffs' counsel and no notification to the Court; is that what you propose?
>
> MR. SELIGMAN: Well, the proposal was to be able to give notification, and that's why we filed this motion.

Transcript of Motions Hearing, Nov. 1, 2002, at 5–6. Thus, in response to the Court's inquiry, defense counsel pointed to the fact that in September, defendants had filed a motion for an order permitting defendants to provide class counsel with copies of the statements of account that they were planning to send out. But defense counsel never contradicted the Court's assertions that class members would lose their rights to appeal the historical accountings provided by defendants if the members did not object within sixty days. Nor did defense counsel make any such statement when the Court raised the issue a second time:

> THE COURT: All right. Do you think you have a right to tell them all their rights are extinguished and not have the Court approve that kind of a notice before you do it?
>
> MR. SELIGMAN: Well, I think that there are very tricky issues of—
>
> THE COURT: It's not tricky at all. Class action litigation, this is a classic question in class action litigation, isn't it?
>
> MR. SELIGMAN: But I think there are— there are issues about APA jurisdiction and what a Court can and can't do.
>
> THE COURT: You've got to tell that one to somebody else other than me.
>
> MR. SELIGMAN: Well, I understand that that's not maybe something you want to hear, and—but the issue isn't so much—
>
> THE COURT: It's something I've already ruled on.

*Id.* at 9. Again, when asked whether defendants possessed the right to extinguish the class members' rights to historical accountings, defense counsel did not claim that the

notices were not intended to have any such effect. Instead, defense counsel responded by challenging the jurisdiction of the Court to adjudicate the instant case.

Nor, when the Court raised the issue for a third time, did defense counsel challenge the statement that the notices would extinguish the rights of class members:

> THE COURT: There's no class action in the history of the country that operates by one party just taking it upon themselves to tell the members of the class all of their rights and privileges and obligations without any consultation with the Court once the class has been certified. How can that be?
>
> MR. SELIGMAN: Well, it's not telling them about all their rights. They're only telling them about the rights with respect to these historical statements of account.
>
> THE COURT: Right.
>
> \* \* \* \* \* \*
>
> THE COURT: How would they know if there is a mistake?
>
> MR. SELIGMAN: Well, it depends on the type of mistake. They may have independent records that show what their share should have been, and they can go and say, "No, no, no. The tribe gave you wrong information, or you got your wrong information somehow," and we can fix these kinds of problems before they ever get to the Court. So there is a whole class—there's thousands of these—of these types of accounts that [the] Department of Interior is able to start doing something on. They have a requirement to do these historical accountings, and—
>
> THE COURT: And if they don't challenge it within 60 days, you're going to argue to me that all their rights are extinguished?
>
> MR. SELIGMAN: Well, I—I don't know what will be argued later. I mean, there is the traditional exhaustion of administrative remedies, and maybe that would be argued, but at the same time I think they—

> THE COURT: That's what you're telling them in this letter: If you don't do it in 60 days, you lose your rights; right?
>
> MR. SELIGMAN: Right. They lose their rights, perhaps, under this accounting, for this accounting, but if overall their [sic] can approach their attorney and they can say, "Wait a minute. Bring this before Judge Lamberth. There is a problem." There certainly is somebody who is—
>
> THE COURT: But you're not telling them they even have an attorney—
>
> MR. SELIGMAN: Well, I'm not telling them—
>
> THE COURT:—since there's no class notification.

*Id.* at 10–11, 13–14. It is true that defense counsel did concede during this colloquy that if class members somehow were to discover an error in the statements of account, they were entitled to "approach" their own counsel to ask them to inform this Court of the error. But defense counsel nowhere challenges the Court's assumption that if class members failed to challenge the statements of account within sixty days, their rights to appeal the statements to the Court would be lost.

Finally, when defense counsel was presented with a fourth opportunity to correct any misunderstanding of the Court as to the intended effect of the notices, defense counsel only confirmed the Court's interpretation:

> THE COURT: I take it, you did misspeak. The regulations [sic] is not proposed, it is in effect.
>
> MR. SELIGMAN: We can go back over the transcript. I don't remember saying that the regulation was just a proposal. I was—my understanding was that the—I was referring to the information that's in the letter that goes with the statement. It just proposes how the information is—or the procedure by which these people are—
>
> THE COURT: Right, but the regulation is in effect, that if they don't take the appeal in 60 days, they lose their rights? It's not a proposed regard.

MR. SELIGMAN: That's my understanding, but, I mean, the regulation as to what it would cover does speak for itself.

THE COURT: Right.

MR. SELIGMAN: So whatever it says is what it covers.

THE COURT: Right.

MR. SELIGMAN: I did want to make clear that when we say we will agree not to send out—basically, we're agreeing we're not going to send out any of these types of statements—

THE COURT: Historical accountings.

MR. SELIGMAN:—historical accountings, but there are quarterly statements—

THE COURT: I understand regular accountings go out all the time, but they're not losing any rights with those, right?

MR. SELIGMAN: No, not that I'm—

THE COURT: Right. This is the only notice where they are going to lose rights.

MR. SELIGMAN: Where they potentially could lose rights, if they don't—

THE COURT: If they don't contest it in 60 days.

MR. SELIGMAN: Yes, Your Honor.

THE COURT: That's the only notices I'm talking about.

MR. SELIGMAN: Okay.

*Id.* at 42–43. Thus, far from undermining the conclusion that the notices represented an attempt to extinguish the rights of class members to a full and accurate historical accounting, the statements of defense counsel actually bolster this conclusion.

The briefs filed by defendants prior to the instant motion are similarly bereft of any claim that the notices, despite their unambiguous language, were not intended to extinguish the rights of class members. In their motion to reconsider, defendants do claim that they are "renew[ing]" an offer they allegedly made in their supplemental opposition brief to inform class members "that any failure to file an administrative appeal within the 60 day period does *not* extinguish the beneficiary's right to an accounting as may be determined in this case." Mot. to Reconsider at 11. But the opposition brief contains

no such offer. Instead, it only offered to inform the class members of the existence of the instant litigation, while continuing to insist that defendants' "communication with the account holders regarding the historical statements of account and the applicable administrative process was appropriate." Defs.' Supp. Opp. Br. at 8.

In fact, defendants' briefs only contain a vague allusion to the possibility of judicial review in a footnote that is, at best, ambiguous:

No account holder has yet had any purported rights extinguished by the 60–day rule or any other aspect of the administrative procedure. If that happens, then and only then, would the issue be ripe for the Court to hear. Interior, of course, does not concede that a challenge would then be appropriate or that the Court would have jurisdiction to challenge the routine administrative process adopted by Interior. Interior only acknowledges that it would then be ripe for review.

*Id.* at 7 n. 6. Thus, while acknowledging that after the expiration of the sixty-day period, the issue of whether the members' rights would then be "ripe," defendants simultaneously mount challenges to the propriety of judicial review and to the notion that the Court would even possess jurisdiction to undertake a review of the administrative process that the notices claimed was "final and cannot be appealed." Accordingly, defendants' convenient post hoc representations that they never intended the notices to extinguish the rights of class members to a full and accurate accounting are demonstrably false.

■ Defendants also insist that the Court's referral of defense counsel to the Disciplinary Panel for violations of Rule 4.2(a) of the District of Columbia Rules of Professional Conduct was both "unwarranted" and "improper" because the attorneys themselves "did not make the communications to the class members." Mot. to Reconsider at 12, 13. Again, defendants completely misconstrue the Court's December 23 opinion, which never rested on such a finding. The language of Rule 4.2(a) provides, in relevant part, that "a lawyer shall not com-

municate *or cause another to communicate* about the subject of the representation with a party known to be represented by another lawyer in the matter" (emphasis added). Therefore, relying on the plain language of the rule, two federal cases, and the statements of three secondary commentators, all of which the Court cited in its opinion, the Court concluded that "knowing participation in the efforts of a defendant to engage in improper communications with members of a class action litigation constitutes a violation of attorney ethics rules." Mem. and Order dated Dec. 23, 2002 at 13.

Instead of confronting the authorities cited in the Court's opinion, defendants cite three cases that they claim bolster their arguments. An examination of these cases demonstrates that they do nothing of the sort. In *EEOC v. McDonnell Douglas Corp.*, 948 F.Supp. 54 (E.D.Mo.1996), the EEOC moved for a protective order prohibiting the defendant from communicating settlement offers to former employees of the defendant who had never filed a complaint with the EEOC, and who had not sought legal representation by the EEOC. The district court specifically noted that "the Defendant has agreed not to communicate directly with the aggrieved parties who have filed a charge of discrimination with the Equal Employment Opportunity Commission." *Id.* at 55. The court denied the EEOC's motion, finding that the communications were permissible under the Missouri Rules of Professional Conduct. Id. *McDonnell Douglas* plainly has nothing to do with the instant case, in which defendants communicated with class members, who are parties in the instant litigation. Moreover, unlike the D.C. Rules of Professional Conduct, the Missouri rules contain no clause prohibiting attorneys from "caus[ing] another to communicate" with represented parties.

Next, defendants cite *Miano v. AC & R Advertising, Inc.*, 148 F.R.D. 68 (S.D.N.Y. 1993) for the proposition that "the DOJ attorneys were under no obligation to prevent communications made by their client (Interior) to its IIM account holders." Mot. to Reconsider at 12. At best, this proposition oversimplifies the holding in that case; at worse, it misstates its conclusions. The issue

in *Miano,* an age discrimination case, was whether the court should suppress taped conversations of the defendant's employees that had been made by plaintiffs, who had failed to inform the employees that they were being taped. *Id.* at 72. One of the grounds for the defendant's suppression motion was that plaintiffs were acting at the behest of their attorney, in violation of Disciplinary Rule 7–104, the forerunner of Rule 4.2 of the Rules of Professional Conduct. *Id.* at 72–73. The Court found that no violation of DR 7–104 had occurred because when the tapings at issue were made, the employees were not represented parties. *Id.* at 80. The Court next turned to the issue of whether plaintiffs' counsel had violated DR–102(A)(4), which prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation" and DR–104(A)(2), which prevents an attorney from "circumvent[ing] a disciplinary rule through the actions of another." *Id.* at 82. Because DR 7–104, like Rule 4.2, prohibits attorneys from "caus[ing] someone else" to communicate with a represented party, the court looked to cases examining DR 7–104 for guidance in its interpretation of the phrase "circumvent[ing] ... through the actions of another." *Id.* at 81–82.

The court began by noting that neither of the two phrases "is susceptible of precise definition, and [thus] by necessity resolution of this issue requires an *ad hoc* determination based upon the facts of each particular case." *Id.* at 82. Having observed that an attorney cannot delegate to another a task that he himself is prohibited from doing, the court continued:

> There is an argument to be made, however, that the constraints on an attorney must go even further, so as to address the situation where he or she does not explicitly instruct another to act but accomplishes the same result indirectly. Therefore, as the Committee on Professional and Judicial Ethics of the New York City Bar Association concluded in the context of DR 7–104(A)(1), "causing" a client to communicate with another party
>
> > ... includes not just using the client as an agent or in the place of the lawyer for making the communication (*i.e.* where

the lawyer directs, supervises or plans the substance of the communication), but also the act of suggesting or recommending to the client that he or she engage in such communication, even though the lawyer has no further involvement in or knowledge of the substance of the communication that subsequently takes place, or the endorsement or encouragement of such a course of action, even when it is first raised or proposed by the client .... [T]he lawyer can still in fact "cause" the client to communicate by observing or advising that it might be desirable for the client to ... speak to the adverse party, if the lawyer's action is a material factor in the client's final decision to engage in such a communication.

N.Y.C. Formal Opinion No.1991–2, at 7. In assessing whether an attorney's acts or words were a material factor in the client's decision, the Committee suggested a focus "not on the client's actual recognized subjective decision-making process, but instead on whether the lawyer's words and actions would reasonably be understood to suggest or encourage that the client engage in the communication." *Id.*, n. 4. *Id.* The Court explained that plaintiffs' counsel's

ongoing discussions and receipt of information from Miano, derived from taped conversations, presents a troubling and close ethical question—whether [counsel] was so embroiled in Miano's conduct so as to be considered to have circumvented the disciplinary rules through Miano. There obviously would be less ambiguity with respect to an attorney's ethical obligations in a situation such as existed in this case, if it was clear that attorneys are either required to control their clients' behavior or so completely disassociate themselves from the clients' behavior so as to preclude any discussion with clients of what action they contemplate or are engaged in. Nevertheless, that is not clearly expected.

*Id.* at 89. Noting that while counsel may have been aware of the tapings, he "did not suggest, plan or supervise what Miano was doing," the court concluded:

Although I believe [counsel] came perilously close to crossing the line of circumventing the disciplinary rules through the actions of Miano, and [that he] would have been better advised to have further distanced himself from Miano's undertakings, I am not prepared to conclude that [his] knowledge of Miano's activity or receipt of information from Miano placed [him] in violation of the disciplinary rules.

*Id.*

Beyond the numerous factual dissimilarities between *Miano* and the instant case, the key difference between the two cases is that in *Miano*, the court was asked to determine whether a violation of the ethical rules had occurred, in order to issue a ruling on the defendant's motion to suppress. By contrast, this Court has not been asked to render a final determination as to whether defense counsel has or has not violated the ethics rules. Instead, Canon 3B(3) of the Code of Conduct for United States Judges directs this Court to "initiate appropriate action when the judge becomes aware of *reliable evidence* indicating the *likelihood* of unprofessional conduct by a judge or lawyer" (emphasis added). In its December 23 opinion, the Court determined that reliable evidence existed "indicat[ing] that defense counsel's participation in the efforts to produce the statements of account constituted a violation of Rule 4.2(a)." Mem. and Order dated Dec. 23, 2002, at 17. Defendants have failed to put forth any evidence that would undermine that conclusion, and thus the Court sees no reason why its referral to the Disciplinary Panel should be rescinded. Accordingly, the Court will leave it to the Disciplinary Panel to determine whether defense counsel committed an infraction of the ethics rules.

Finally, defendants cite *United States v. Lemonakis*, 485 F.2d 941 (D.C.Cir.1973) for the proposition that "an attorney is not responsible for communications made by another unless that person is acting as the attorney's 'alter ego.'" Mot. to Reconsider at 12. But *Lemonakis*, another case in which the issue presented was whether to suppress a series of taped conversations, made no such broad finding. In that case, an informant, acting under the direction of the U.S. Attor-

ney's office, surreptitiously taped conversations between suspects in a series of burglaries and himself. *Lemonakis,* 485 F.2d at 946. The death of the informant prior to trial forced the government to resort to the tapes as its primary evidence against the defendants, who moved to suppress the tapes. *Id.* at 947. After rejecting the defendants' Fifth and Sixth Amendment arguments, the court turned to their claim that government attorneys had violated the no-contact rule with respect to the defendants who had retained counsel at the time that the taped conversations took place. Acknowledging that the claim "present[ed] a somewhat novel claim for this court," the court nevertheless concluded, on the specific facts presented, that the attorneys had not violated the no-contact rule. *Id.* at 955. After quoting *United States v. Massiah,* 307 F.2d 62 (2d Cir.1962), *rev'd,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the court explained:

> Similarly here, in a non-custodial situation, the Government's instructions to its informant, although provided by a U.S. Attorney as well as the investigating officers, were not such as to constitute [the informant] the "alter ego" of the U.S. Attorney's office. Moreover, the *Massiah* surveillance was undertaken after the indictment of the suspect. Here, in the investigatory stage of the case, the contours of the "subject matter of the representation" by appellants' attorneys, concerning which the code bars "communication," were less certain and thus even less susceptible to the damage of "artful" legal questions the Code provisions appear designed in part to avoid. Finally, we cannot say that at this stage of the Government's investigation of a criminal matter, the public interest does not-as opposed to the different interests involved in civil matters permit advantage to be legally and ethically taken of a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. We find there was no ethical breach by the U.S. Attorneys prosecuting the case; accordingly, we need not reach what legal consequences might flow had we concluded otherwise.

*Id.* at 956 (internal citations omitted). The factual and legal differences between *Lemonakis* and the instant case are so numerous that it hardly suffices merely to say that the earlier case is inapposite. However, the Court will limit itself to observing that nowhere in *Lemonakis* does the D.C. Circuit "ma[k]e clear that an attorney is not responsible for communications made by another unless that person is acting as the attorney's 'alter ego.'"

In short, defendants' motion to reconsider fails to set forth any persuasive arguments why this Court should reconsider the opinion it issued on December 23, 2002. Instead, defendants misinterpret the language contained in the notices they mailed to class members, misrepresent statements made by their defense counsel to this Court, and mischaracterize the holdings of the cases that they claim lend support to their arguments, all in an attempt to re-open issues that have already been the subject of two rounds of briefing and oral arguments. There is no better way to waste the limited resources of a court than for a party to ask it to return to issues that the party has already litigated and lost. In their surreply to plaintiffs' motion for a preliminary injunction and a Rule 23 order, defendants announced that "[b]riefing on this issue is now complete." Defs.' Surreply at 1. Briefing on these issues is now more than complete. Accordingly, it is hereby

ORDERED that defendants' motion for reconsideration of the Court's December 23, 2002 order [1715–1] be, and hereby is, DENIED.

SO ORDERED.